J-A16010-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| JOHN R. FREY, ELAINE H. FREY, ROBERT G. FREY, JAMES MILLER, AND ROBIN MILLER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| BONNY GOLD, DENNIS GOLD, SLURRY TECHNOLOGIES OPERATING, LLC, SLURRY TECHNOLOGIES OPERATING, INC., PILGRIM ENERGY COMPANY, PILGRIM COAL COMPANY, CHARLES MUSE, A.C. MUSE, ENSUM PARTNERSHIP NO. 2, SLURRY TECHNOLOGIES, INC., AGGREGATE SOLUTIONS, INC., ALBERT C. MUSE/REPRESENTATIVE OF THE ESTATE OF CHARLES H. MUSE, JR., DECEASED, ALBERT C. MUSE/REPRESENTATIVE OF THE ESTATE OF CHARLES HOWARD MUSE, JR.. | |
| APPEAL OF:  SLURRY TECHNOLOGIES OPERATING, INC., PILGRIM ENERGY COMPANY, PILGRIM COAL COMPANY, CHARLES MUSE, A.C. MUSE, ENSUM PARTNERSHIP NO. 2, SLURRY TECHNOLOGIES, INC., AGGREGATE SOLUTIONS, INC., ALBERT C. MUSE/REPRESENTATIVE OF THE ESTATE OF CHARLES H. MUSE, JR., DECEASED, ALBERT C. MUSE/REPRESENTATIVE OF THE ESTATE OF CHARLES HOWARD MUSE, JR. | No. 1120 WDA 2016 |

Appeal from the Judgment Entered July 6, 2016
In the Court of Common Pleas of Venango County
Civil Division at No: 2002-00232

J-A16010-17

BEFORE:  STABILE, J. FORD ELLIOTT, P.J.E. , and STRASSBURGER,* J.

MEMORANDUM BY STABILE, J.:                    **FILED OCTOBER 31, 2017**

Appellants[1] appeal from the judgment entered on July 6, 2013 in favor of Appellees, John R. Frey, Elaine H. Frey, Robert G. Frey, James Miller, and Robin Miller.  We affirm.

The trial court summarized the pertinent facts in its Pa.R.A.P. 1925(a) opinion:

> Plaintiff H. Elaine Frey ("Elaine or Elaine Frey") invested in an entity known as Slurry Technologies Operating, LLC in 1997, hereinafter referred to as "STO."  Defendant Bonny Gold was the 60% capital stock holder or majority owner of STO and Elaine Frey was the 40% owner and minority stock holder.  Bonny Gold's husband and co-Defendant, Dennis Gold, was the president of STO.  Plaintiff John Frey, the husband of Elaine, was employed at STO as an engineer.
>
> STO provided water purification technology in the coal mining industry.  More specifically, the company was involved in the sale, design, construction and operation of equipment for the processing of industrial slurries.  Dennis Gold contributed his patents for purification and Elaine Frey agreed to pay $150,000 to help capitalize the company.  Bonny Gold and Elaine Frey entered into a Pre-Incorporation Agreement dated November 15,

_____

* Retired Senior Judge assigned to the Superior Court.

[1]  We refer to these parties collectively as Appellants:  Slurry Technologies Operating, Inc., Pilgrim Energy Company, Pilgrim Coal Company, Charles Muse, A.C. Muse, Esum Partnership No. 2, Slurry Technologies, Inc., Aggregate Solutions, Inc., Albert C. Muse/Representative of the Estate of Charles H. Muse, Jr., Deceased, Albert C. Muse/Representative of the Estate of Charles Howard Muse, Jr.

- 2 -

1996.   The two entered into an Operating Agreement a short time thereafter.

On February 16, 1999, Pilgrim Coal Company made a loan to both STO and a separate company named Slurry Technologies Operating Inc., hereinafter "STI", in the amount of $250,000.00.[1]

> [1]   Pilgrim Coal Company later rebranded as "Pilgrim Energy Company."   Together, they are hereinafter referred to simply as "Pilgrim."

Charles H. Muse, Jr. was the president and director of Pilgrim Coal Company at the relevant time for this proceeding.  Albert C. Muse was Vice-President of Pilgrim Coal Company at the relevant time for this proceeding and was Charles H. Muse Jr.'s first cousin.   Collectively, Albert C. Muse and Charles H. Muse Jr. would from time to time capitalize business under the trade name of "ENSUM Partnership No. 2."   The Loan Agreement in question (the "Pilgrim Loan Note") was signed by Dennis D. Gold, as Vice Chairman of STO, Dennis D. Gold, as President of STI, and Charles H. Muse, Jr., President of Pilgrim Coal Company.   Elaine Frey and Bonny Gold signed a Certificate of Authorization by the Members of STO to the Loan Agreement. The Pilgrim Loan would eventually be defaulted on in 2001.

Plaintiffs G. Robert Frey and Sue Frey, the parents of John Frey, agreed to offer a $50,000.00 Certificate of Deposit ("CD") account as collateral for a loan for STO.  The Note therefore was signed on behalf of STO by Dennis Gold on November 6, 2000.

On October 3, 2001, John and Elaine Frey instituted an action against Dennis Gold, Bonny Gold, and STO asserting causes of action for violations of the Pennsylvania Wage Payment and Collection Law (hereinafter "WPCL" *see* 43 P.S. §§ 260.1—260.12), for breach of contract, for wrongful termination, for unjust enrichment, for breach of duty of good faith and fair dealing, for breach of fiduciary duty, for an accounting, for freeze out, for fraudulent misrepresentation, for repayment of loans, for civil conspiracy and for a declaratory judgment.   Around the same time, Robert and Sue Frey also instituted an action against STO and Dennis Gold alleging breach of contract, breach of security agreement, fraudulent misrepresentation and requesting the imposition of a

constructive trust. Both of these suits were eventually consolidated with the instant action.

On November 30, 2001, a meeting occurred between Albert and Charles Muse with John and Elaine Frey in Pittsburgh. The content of the discussion that took place at that meeting is disputed, but essentially the Muse Defendants offered to provide John and Elaine Frey a limited interest in an STO successor company, provided that the Freys would in return cease their litigation against the Defendants. John Frey, believing the settlement offer to be inadequate for various reasons, declined.

As previously mentioned, STO defaulted on the Pilgrim Loan Note in 2001. On November 5, 2001, Pilgrim filed a confession of Judgment against STO, STI, and Dennis and Bonny Gold in the amount of $365,627.23 pursuant to the terms of the Pilgrim Loan Note. The Gold Defendants took no steps to defend against the judgment nor did they attempt to delay the execution of the sheriff's sale. Accordingly, a sheriff's sale was held on December 19, 2001. The sale took place at the offices of STO. At that sale, Pilgrim purchased all the physical assets of STO and/or STI. These assets include several service contracts, the most notable of which was the "Hanson Contract," an agreement to provide STO's slurry-processing services to an energy company located in Texas.

The instant action was initiated pursuant to the Writ of Summons of John and Elaine Frey [as] of February 22, 2002. Though this action asserts many different rights of redress under a variety of legal theories, perhaps the core allegation by the Plaintiffs is that the Gold and Muse Defendants acted in concert to deprive John and Elaine Frey of their respective employment and ownership positions at STO such that the Muse and Gold Defendants could enjoy the fruits of the water purification business to the exclusion of John and Elaine Frey. In particular, they allege that the Gold Defendants did not contest the acquisition of STO (the primary asset of which was the Hanson contract) at the time of the sheriff's sale. In exchange for that cooperation, the Muse Defendants agreed to reward the Gold Defendants both with employment and an ownership stake in STO's successor company. Indeed, it is uncontested that the Muse Defendants did employ Dennis Gold at STI following their acquisition of the company, that this employment occurred in the exact office space utilized by STO prior to the sheriff's sale,

and that STO and STI share remarkably similar monikers. STI would eventually rebrand as "Aggregate Solutions, Inc."

Trial Court Opinion, 10/7/16, at 2-5.

This case proceeded through a lengthy discovery period, during which the trial court sanctioned the Gold Defendants numerous times. Given the Gold Defendants' numerous failures to comply with Appellees' discovery requests and trial court orders compelling the same, the trial court entered an order precluding the Gold Defendants from contesting liability at trial (the Gold Defendants are appealing the discovery sanctions in a companion case, No. 1150 WDA 2016).

A jury trial began on November 14, 2014, and concluded on November 24, 2014. The jury found in favor of Appellees on most of their claims.[2] The trial court denied Appellants' motions for post-trial relief on June 13, 2016. On July 6, 2013, the verdict was reduced to judgment. This timely appeal followed.

_____

[2] Against the Gold Defendants, the jury awarded John Frey $77,114.00 on his WPCL claim and $70,833.00 for wrongful discharge. The jury awarded Elaine Frey $150,000.00 for breach of fiduciary duty. The jury also awarded $32,423.00 for unpaid loans, $40,147.00 for unreimbursed MNBA statements, $400,000.00 for intentional interference with contractual relations, $500,000.00 for fraudulent misrepresentation, and $449,232.00 for civil conspiracy to John and Elaine Frey. The jury also awarded G. Robert Frey and Sue Frey $300,000.00 for their civil conspiracy claim against the Gold Defendants. Against the Muse Defendants (including Pilgrim and ESUM), the jury awarded Elaine Frey $635,000 on her fraudulent transfer claim. To John and Elaine Frey, the jury awarded $165,000 for intentional interference with contractual relations, $100,000 for fraudulent misrepresentation, and $200,000 for civil conspiracy.

Appellants state thirteen questions (Appellants' brief at 12-13) but their argument section is divided into eight sections, with several of the questions presented consolidated into one argument. We will review each of the eight argument sections in turn.[3]

We review the trial court's denial of Appellants' JNOV motion as follows:

> Appellate review of a denial of JNOV is quite narrow. We may reverse only in the event the trial court abused its discretion or committed an error of law that controlled the outcome of the case. Abuse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias or [ill will].
>
> When reviewing an appeal from the denial of a request for [JNOV], the appellate court must view the evidence in the light most favorable to the verdict[-]winner and give him or her the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences.... Thus, the grant of [JNOV] should only be entered in a clear case and any doubts must be resolved in favor of the verdict[-]winner....
>
> It is axiomatic that[ ] there are two bases upon which [JNOV] can be entered: one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. To uphold JNOV on the first basis, we must review the record and conclude that even with all the factual inferences decided adverse[ly] to the movant the law nonetheless requires a verdict in his favor, whereas with the second we review the evidentiary record and

_____

[3] We remind counsel that the Pennsylvania Rules of Appellate Procedure require one argument section for each question presented. Pa.R.A.P. 2119(a).

conclude that the evidence was such that a verdict for the movant was beyond peradventure.

***Sears, Roebuck & Co. v. 69th St. Retail Mall, L.P.***, 126 A.3d 959, 967 (Pa. Super. 2015) (internal citations and quotation marks omitted).

Appellants first challenge the jury's valuation of STO for purposes of Elaine Frey's Uniform Fraudulent Transfer Act ("UFTA")[4] claim. As summarized above, Appellees John and Elaine Frey founded STO together with Dennis and Bonny Gold. Bonny Gold was majority owner, Elaine Frey was minority owner, Dennis Gold was company president, and John Frey was employed as an engineer. Elaine Frey contributed money to capitalize STO. Eventually, the Muse Defendants, by and through Pilgrim and ENSUM, made a loan to STO on which STO defaulted. The Muse Defendants obtained STO's assets at a sheriff's sale with no opposition from the Golds.

Appellees' Amended Complaint alleges that the sheriff's sale and transfer of STO's assets were done to defeat Plaintiffs' claims as creditors of STO. Amended Complaint, 1/21/03, at ¶¶ 71-79. Thus, they alleged a cause of action against all defendants under the UFTA. The jury found in favor of Elaine as against the Muse Defendants and Pilgrim, and valued the company at $1,000,000.00 as of the time of the sheriff's sale. Pursuant to the trial court's jury instructions, the jury awarded her $635,000.00

---

[4] 12 Pa.C.S.A. §§ 5101-5110.

(allowing for Pilgrim's outstanding $365,000.00 judgment against STO) on the UFTA claim.[5]

The Muse Defendants claim that no evidence of record supports the jury's $1,000,000.00 valuation. Plaintiffs claim the valuation was justified based on a contract (the "Hanson Contract") whereby STO was to provide its water purification services to Hanson Aggregates in Texas. The Muse defendants respond that the Hanson Contract was never profitable for STO, and that valuation of STO's profitability, given that it was a relatively new entity as of the sheriff's sale date, is highly speculative.[6]

_____

[5] We observe that Appellants' first argument does not address any provision of the UFTA.

[6] Appellees also argue this issue is waived. They correctly note that a party wishing to challenge the sufficiency of the evidence cannot do so for the first time in a motion for post-trial relief under Rule 227.1. Pa.R.C.P. No. 227.1(b)(1); **Haan v. Wells**, 103 A.3d 60, 67-68 (Pa. Super. 2014). Appellants did not challenge the sufficiency of the evidence of the UFTA claim when they moved for compulsory nonsuit at the close of Appellees' case. N.T. Trial, 11/20/14, at 16-22. We further observe that Appellants have failed to cite the portion of the record where they preserved this issue (or any other issue they have raised on appeal), in violation of Pa.R.A.P. 2117(c). In any event, we decline to find waiver because the precise issue before us was not available until the jury rendered its verdict. STO's valuation as of the time of the sheriff's sale (the alleged fraudulent transfer for purposes of the UFTA claim) was the subject of much disputed evidence at trial. The jury found STO to be worth $1 million, a seeming compromise between John Frey's testimony that the Hanson Contract was worth at least $4 million, and Appellants' evidence that the Hanson Contract was unprofitable and that STO was in serious financial distress. Thus, the $1 million dollar valuation presently at issue did not arise until the jury returned its verdict. Thus, the argument on appeal was not available during trial within the meaning of Rule 227.1(b)(1).

Appellants rely exclusively on cases holding that damages for lost profits must not be speculative or conjectural. Appellants' are correct in their statement of the law. "Though damages for alleged lost profits can be given, they cannot be recovered where they are merely speculative." ***Delahanty v. First Pennsylvania Bank, N.A.***, 464 A.2d 1243, 1258 (Pa. Super. 1983). "Whereas recovery for the lost profits of an established business are considered ascertainable to a reasonable degree of certainty, […] when a business is new and untried, courts have declared the measure of anticipated profits too speculative to provide a basis for an award of damages." ***Id.*** Nonetheless, we recognize that the assessment of damages is within the province of the jury. ***Betz v. Erie Ins. Exch.***, 957 A.2d 1244, 1264 (Pa. Super. 2008), ***appeal denied***, 995 A.2d 350 (Pa. 2010). This Court must remain cognizant that the trier of fact is in a "superior position to appraise and weigh the evidence. ***Id.*** (quoting ***Delahanty***, 464 A.2d at 1257). Thus:

> While the trier of fact may not use sheer conjecture as a basis for arriving at a verdict, it may use a measure of speculation in aiming at a verdict or an award of damages, and an even greater degree of flexibility is granted in regard to testimony concerning prospective or future damages, which are at best, not always easy or certain of ascertainment and are to a large extent based on probabilities and uncertainties. So then, mere uncertainty as to the amount of damages will not bar recovery where it is clear that the damages were the certain result of the defendant's conduct.

***Delahanty***, 464 A.2d at 1257.

Appellees argue that STO's future profitability is not relevant because the jury was asked to determine STO's value as of the date of the sheriff's sale.

John Frey testified as to the amounts of money STO would receive under the Hanson Contract, including monthly management fees and costs. N.T. Trial, 11/14/14, at 95-98, 102, 156-60. In particular, STO was to receive a $14,000 per month management fee over the life of the 84 month contract, for a total of more than $1.1 million. *Id.* at 98. In addition to the management fee, STO was to receive fees for its dredging services. *Id.* at 102-03, 156-60. John Frey estimated that the profit margin for dredging was $45.00 per hour, and that STO would realize more than $4.2 million in profit over the life of the Hanson Contract. *Id.* Thus, Elaine Frey's 40% stake would have been almost $1.7 million. *Id.* at 160. John Frey also testified as to several years of invoices from Aggregate Solutions, Inc. (the successor of STO and STI) to Hanson. *Id.* at 154-57. Appellants vigorously disputed this evidence, and they continue to argue that John Frey failed to account for overhead and other costs that more than offset the value of the Hanson Contract.

The trial court summarized the matter as follows:

> John Frey's estimations of the value of the Hanson [C]ontract were not a foundationless 'assumption,' but were instead derived from the invoices supplied to STO by Hanson, by Dennis Gold's estimated profit margins, and by the calculations therefrom made by John Frey. Moreover, a review of the Hanson [C]ontract itself indicates that it was structured such

- 10 -

that STO would be safeguarded against assuming losses. John Frey's testimony regarding the valuation of the Hanson [C]ontract was undoubtedly based to a certain extent upon his educated projections, and as such his estimation of four-million odd dollars was by no means entirely certain. However, the facts in evidence were such that the jury was free to reject the Muse Defendant's assertion that the Hanson [C]ontract was totally worthless at the time it was transferred.

Trial Court Opinion, 8/29/16, at 10-11.

Given the foregoing, we conclude that the record supports the jury's valuation. Valuation of STO as of the date of the sheriff's sale unavoidably involved some speculation, but this Court made clear in **Delahanty** that a degree of speculation based upon the evidence is permissible, whereas sheer conjecture is not. The trial court did not err in denying Appellants' motion for post-trial relief.

Next, Appellants assert that no evidence supports the jury's finding that the Muse Defendants, by and through Pilgrim and ENSUM Partnership No. 2, committed tortious interference with Appellees' contractual relations. The jury found interference with STO's pre-incorporation agreement and its employment agreement with John Frey. Appellants argue there was no contract to be interfered with. The elements of tortious interference with contractual relations are as follows:

(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual legal damage as a result of the defendant's conduct.

***Strickland v. Univ. of Scranton***, 700 A.2d 979, 985 (Pa. Super. 1997).

Appellants do not offer a detailed review of the evidence presented at trial. Their legal analysis is limited to the first prong of the cause of action— the existence of a contract. As the trial court noted, Appellees introduced STO's pre-incorporation agreement, which included John Frey's employment agreement. John Frey testified as to his contract with STO and his termination from STO at the behest of the Muse Defendants. N.T. Trial, 11/14/14, at 108-11. Robert Frey, John's father and a creditor of STO, also gave a similar account of John's termination. N.T. Trial, 11/19/14, at 101-02. The jury clearly credited the Freys' testimony. The trial court found that Appellants motion for post-trial relief "essentially asks the [c]ourt to variously discount, reject or ignore [Appellee's] evidence. Given the exacting standard by which we must evaluate a request for judgment notwithstanding the verdict, we will decline to do so."

Appellants have failed to articulate any meritorious challenge to the trial court's ruling. Their second argument fails.

Next, Appellants argue that the $1,000,000.00 judgment against Pilgrim under the UFTA was entered in error. Appellants argue that STO was in default on a loan from Pilgrim, and that "the verdict entered by the jury

essentially would require that Pilgrim waive its rights to collect on its loan in favor of the Frey's obtaining some return on the value of their investment." Appellants' Brief at 29. Appellants go on to argue that the sheriff's sale of STO was properly noticed, conducted legally, and that there is no evidence that the sale price was grossly inadequate. *Id.* at 30. Appellants also argue there was no evidence of collusion between or among the various defendants. *Id.* Finally, Appellants state that Appellees never moved to set aside the sale and therefore have waived any challenge to its propriety. *Id.* at 30-31.

Appellants' argument ignores the theory that underlies all of Appellees' causes of action—that the Golds and the Muse Defendants colluded to deprive Appellees of their valuable employment and ownership interests in STO. Appellees alleged that the sheriff's sale was one step in that process. The jury's verdict demonstrates that they credited Appellees' evidence in support of their theory. Thus, the legal propriety of the sheriff's sale is of no moment. The focus of this litigation is Appellants' course of conduct before and after the sale.

Appellants do not develop any detailed argument under the provisions of the UFTA. Rather, this argument is simply another challenge to the jury's valuation of Appellees' damages. We have already addressed the propriety of the jury's valuation in response to Appellants' first argument. Appellants' third argument does not merit relief.

Appellants' fourth argument is that Appellant Pilgrim cannot be liable to Appellees under the UFTA for more than the value of the transferred asset. Appellants' cite no facts and only one provision of law: § 5108(b)(1)[7] of the UFTA, which limits the liability of the transferee to the value of the assets transferred. This is simply another challenge to the jury's valuation of STO. Indeed, Appellants expressly rely on their first argument, in which they asserted that STO was not profitable and that the Hanson Contract was of no value. Appellants' Brief at 31. Appellant's fourth argument fails because it depends upon the success of another argument we have already rejected.

For their fifth argument, Appellants assert that the evidence does not support the jury's finding that Pilgrim and Ensum Partnership No. 2 engaged in a civil conspiracy.

_____

[7] Section 5108(b)(1) reads:

> **(b) Judgment for certain voidable transfers.--**Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under section 5107(a)(1) (relating to remedies of creditors), the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c), or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:
>
> (1) the first transferee of the asset or the person for whose benefit the transfer was made;

12 Pa.C.S.A. § 5108(b)(1).

The essential elements of a claim for civil conspiracy are as follows: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage.

*Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. 2008), *appeal denied*, 967 A.2d 960 (Pa. 2009). A civil plaintiff must prove a conspiracy by "full, clear and satisfactory evidence." *Id.*

Appellants argue that officers and directors acting in their corporate capacity cannot conspire with their company. They cite *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 473 (Pa. 1979), in which our Supreme Court held wrote: "To hold that [the defendant] could have entered into an illegal agreement with the legal entity of which he was sole stockholder, director and officer would be without legal or rational basis." *Id.* This principle is inapposite here, as Appellees alleged a conspiracy between the Gold Defendants and the Muse Defendants. Prior to the formation of STI, the Golds and the Muses were not part of the same company.

Appellants also argue that the Appellees' complaint was not clear as to the alleged conspiracy. Appellants' contention is inaccurate. As we have discussed above, Appellees alleged, among other things, that Appellants conspired to freeze Elaine Frey out of her ownership interest in STO, to breach STO's employment agreement with John Frey, and to breach promises to repay loans. Amended Complaint, 1/21/03, at ¶¶ 62-66. Appellees also alleged millions of dollars in damages resulting from

Appellants' conspiratorial actions. Appellees produced sufficient evidence to survive a summary judgment motion, and the jury found in their favor.

To the extent that Appellants rely on the legality of the sheriff's sale, the trial court accurately noted that the sheriff's sale may have been a lawful act, but [Appellees] alleged it was done for an unlawful purpose in accord with prong one of the civil conspiracy analysis. Trial Court Opinion, 10/7/16, at 17; **Phillips**, 920 A.2d at 437. Appellants' fifth argument lacks merit.

Appellants' sixth argument is that the trial court should have granted their motion to mold the verdict to reflect the amount of money that Pilgrim loaned to STO. Appellants devote only one paragraph to this argument, with no citation to the record or pertinent legal authority. As such, they have waived this argument. Pa.R.A.P. 2119(b) and (c); **Giant Food Stores, LLC v. The Silver Spring Dev., L.P.**, 959 A.2d 438, 444 (Pa. Super. 2008), **appeal denied**, 972 A.2d 522 (Pa. 2009). In any event, this argument is meritless. As explained above, the jury valued STO at $1 million dollars and the amount was reduced by $365,000.00—in accordance with the trial court's instructions—to a $635,000.00 verdict in favor of Elaine Frey. The $365,000.00 difference represented the amount of Pilgrim's judgment against STO.

For their seventh argument, Appellants argue the trial court should not have awarded prejudgment interest on non-contractual causes of action,

specifically the UFTA. In **Rizzo v. Haines**, 555 A.2d 58 (Pa. 1989), our Supreme Court addressed prejudgment interest in tort cases.

> In [tort] cases the party chargeable cannot pay or make tender until both the time and the amount have been ascertained, and his default is not therefore of that absolute nature that necessarily involves interest for the delay. But there are cases sounding in tort, and cases of unliquidated damages, where not only the principle on which the recovery is to be had is compensation, but where also the compensation can be measured by market value, or other definite standard.... Into these cases the element of time may enter as an important factor, and the plaintiff will not be fully compensated unless he receive, not only the value of his property, but receive it, as nearly as may be, as of the date of his loss. Hence it is that the jury may allow additional damages, in the nature of interest, for the lapse of time.

*Id.* at 70. Further:

> [T]he decided trend of courts of law and of equity has been to break away from hard and fast rules and charge and allow interest in accordance with principles of equity, in order to accomplish justice in each particular case. .... Unless a case be found, which is a conclusive precedent, the safest and at the same time the fairest way for a court is to decide questions pertaining to interest according to a plain and single consideration of justice and fair dealing.

*Id.*

Appellants cite and/or quote the aforementioned passages of **Rizzo**, and then conclude by arguing that Appellees causes of action sound in tort, that the damage amounts were not easily measurable, and that Appellees therefore were not entitled to prejudgment interest. Appellants' Brief at 34. Appellants misread **Rizzo**, which did not hold that prejudgment interest is precluded where the plaintiff's damages are not easily measurable. Rather,

the **Rizzo** Court counseled the lower courts to consider justice and fair dealing. Instantly, the trial court did just that. The trial court reasoned that Appellees were diligent in their prosecution of this action; that Appellants were unjustly enriched by misconduct; and that interest would help compensate Appellees for their loss of employment and inability to profit from the Hanson Contract. Trial Court Opinion, 10/7/16, at 24-25. Because the trial court's award of prejudgment interest is in accord with **Rizzo**, Appellant's seventh argument lacks merit.

In their eighth and final argument, Appellants claim that the evidence does not support the jury's findings of fraud and fraudulent misrepresentation. Appellant's Brief at 35. Once again, Appellants have failed to offer any record citations in support of their claim. Appellants' only legal authority is a case delineating the elements of fraudulent misrepresentation. Appellants' brief is not sufficient to preserve this claim. Pa.R.A.P. 2119(b) and (c); **Giant Food Stores, LLC**, 959 A.2d at 444. In addition, Appellants failed to include these issues in their concise statement of matters complained of on appeal, resulting in waiver under Pa.R.A.P. 1925 (b)(4)(vii).

In summary, we have concluded that Appellants' arguments lack merit or are waived. We therefore affirm the judgment.

Judgment affirmed.

Judgment Entered.

- 18 -

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>10/31/2017</u>